UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| IN RE: INLAND MARINE | : | Case No. 1:14-cv-833 |
| SERVICE, INC., *et al*., | : | |
| | : | |
|       Petitioners, | : | Judge Timothy S. Black |
| vs. | : | |
| | : | |
| ESTATES OF J.M. STACK & | : | |
| B.B. EASTLICK, | : | |
| | : | |
|       Respondents. | : | |

## ORDER DENYING PETITIONERS' MOTION FOR SUMMARY JUDGMENT (Doc. 61)

This civil action is before the Court on Petitioners' motion for summary judgment (Doc. 61) and the parties' responsive memoranda (Docs. 65, 66, 70).

## I.    BACKGROUND FACTS

The events which occurred on September 25, 2014 in the Cincinnati harbor (near the Purple People Bridge) reflect a sad story.  Bryce B. Eastlick and John M. Stack lost their lives when their pleasure craft (the "Eastlick boat") collided with the tow of the M/C Caleb Lay, an inland river towing vessel owned by Petitioners.

The Stack and Eastlick Estates have asserted claims against Petitioners for wrongful death, pre-death conscious pain and suffering, and loss of consortium/mental anguish.  (Docs. 10, 11).

## II.    PETITIONERS UNDISPUTED FACTS[1]

1.    This case arises from a September 25, 2014 boating incident in which a 19'
pleasure craft owned by Bryce and Anna Eastlick (the "Eastlick boat") collided
with the tow of the M/V Caleb Lay, a 5,000 horsepower inland river towing
vessel operated by Petitioner Inland Marine Service, Inc.  (Doc. 1 at ¶¶ 4, 8; Doc.
1-1 at ¶ 4; Doc. 61-2 at 66).

2.    At the time of the incident, the Eastlick boat was occupied by Bryce Eastlick
and John Stack II.  (Doc. 1 at ¶ 8).

3.    The incident occurred at or around Ohio River Mile 470 in the Port of Cincinnati
at approximately 11:00 p.m.  (Doc. 1 at ¶ 8).

4.    Just prior to the collision, the M/V Caleb Lay was traveling upriver at an
approximate speed of 4-4.2 miles per hour and the Eastlick boat was headed
downriver.  (Doc. 1 at ¶ 8).

5.    Eastlick and Stack were both killed in the collision.  (Doc. 1 at ¶ 8).

6.    At the time of the incident, the M/V Caleb Lay was owned by Petitioner Lay
Leasing, Inc.  (Doc. 1 at ¶ 4).

7.    Petitioners AEP River Operations LLC and Inland Marine Service, Inc. were the
owners *pro hac vice* of the M/V Caleb Lay by virtue of bareboat charter
agreements.  (Doc. 1 at ¶ 4).

8.    The M/V Caleb Lay was crewed and operated by Inland Marine.  (Doc. 1 at ¶ 4).

9.    The crew of the M/V Caleb Lay consisted of a captain, a pilot, five deckhands, an
engineer, and a cook.  (Doc. 61-3 at 28).

10.    On September 25, 2014, Michael Forbess was the captain and Kenneth Long was
the pilot.  (Doc. 61-3, Ex. 5; Doc. 61-4 at 35).[2]

---

[1]  *See* Docs. 61-1, 64-1, and 66.

[2]  Claimant Eastlick admits this statement based on the testimony of Captain Michael Forbess and
Pilot Kenneth Long, but also denies the statement based upon inconsistent statements made by
Pilot Long.  (Doc. 61-4, Ex. 27).

11.    Long boarded the M/V Caleb Lay at Clifty Creek, Ohio River Mile 560, on September 23, 2014 at 13:00.  (Doc. 61-4 at 42, Ex. 4).

12.    Two days later, during the early afternoon of September 25, 2014, Forbess boarded the vessel at Tanner's Creek, Ohio River Mile 494.  (Doc. 61-3 at 53, 56, Ex. 4).  Forbess is on the sixth issue of his Coast Guard license and has been piloting vessels for 30 years.  (Doc. 61-3 at 135, 189-190).

13.    Long has been working on the river since 1969 and has been piloting vessels since 1977.  (Doc. 61-4 at 10, 13).

14.    On the date of the incident, the M/V Caleb Lay was traveling upriver on the Ohio River.  Forbess went on watch by 17:15, relieving Long.  (Doc. 61-3 at 67).

15.    During their watch change discussion, Long did not report any problems with the operation of the vessel.  (Doc. 61-3 at 59; Doc. 61-4 at 49, 54).

16.    During the period of 18:40-20:10, the M/V Caleb Lay performed tow work at the McGinnis 480 fleet.  (Doc. 61-3 at 66-69).

18.    Specifically, the M/V Caleb Lay dropped off five barges.  (Doc. 61-3 at 69).

19.    After the tow work was completed, the tow was configured in two strings of five loaded barges, with an empty barge on the port bow.  (Doc. 61-3 at 75, Ex. 8; Doc. 61-4 at 65).

20.    The bow of the tow was 105' wide.  (Doc. 61-3 at 205).

21.    By the time they departed the McGinnis fleet at 20:10, the deck crew had placed the portable tow lights on the head of the tow; a red light on the port, a flashing amber light in the center, and a green light on the starboard.  (Doc. 61-6 at 45-46, 57-58, Ex. 19; Doc. 61-9 at 52-53).

22.    The tow lights are equipped with sensors that cause them to automatically illuminate at dusk.  (Doc. 61-6 at 43; Doc. 61-9 at 44).[3]

23.    As the M/V Caleb Lay got underway and headed upriver into the Cincinnati harbor, it was running at fuel economy, operating at 4-4.2 miles per hour. (Doc. 61-3 at 82, 90, 143; Doc. 61-4 at 69, 96).

---

[3] Claimant Stack admits this statement, but maintains that the tow lights are also equipped with an on/off switch.  (Doc. 61-6 at 43-44).

24.     There was no weather in the area and the river was at pool stage.  (Doc. 61-3 at 198, 219-220; Doc. 61-4 at 93).

25.     Meanwhile, Eastlick and Stack had decided to take the Eastlick boat out onto the Ohio River in order to listen to the Dierks Bentley concert at Riverbend.  (Doc. 61-2 at 32-34, 62).

26.     They departed the Eastlick house between 5:00 and 5:30 p.m.  (Doc. 61-2 at 35).

27.     Forbess was standing behind Long, who had just taken a seat in the captain's chair.  (Doc. 61-3 at 148-150, 155, Ex. 23-24; Doc. 61-4 at 92).

28.     Forbess observed the Eastlick boat, traveling downriver.  (Doc. 61-3 at 148-150, 156, 160, Ex. 23-24).

29.     Forbess testified that he was not alarmed by the approaching Eastlick boat.  (Doc. 61-3 at 156-158).[4]

30.     Prior to impact, Pilot Long saw a "glimpse of white light."  (Doc. 61-4 at 142).

31.     The Cincinnati harbor is designated a no wake zone.  Forbess testified that the Eastlick boat was traveling 30 miles per hour or faster.  (Doc. 61-3 at 102, 150, 157; Doc. 61-4 at 96; Doc. 61-5 at 144-154).

32.     A text message sent by Stack at 22:54, just minutes prior to the collision, states: "I'm doing about 60mph on the water rigt (sic) now."  (Doc. 61-8 at 9, #10).[5]

33.     After spotting the Eastlick boat, Forbess visually tracked it as it continued downriver off to the port side.  (Doc. 61-3 at 221, 223).

34.     The Eastlick boat turned to its port, striking the port side of the starboard lead barge.  (Doc. 61-3 at 148-150, 160, 256, Ex. 23-24; Doc. 61-4 at 134).

---

[4]  The claimants deny any inference that Forbess should not have been alarmed or should not have taken action.

[5]  Claimant Eastlick admits that this is what the text message said, but denies for lack of knowledge whether the information contained in the text was accurate.

35.  The Eastlick boat disappeared in front of the starboard lead barge following this initial impact.  (Doc. 61-3 at 148-150, Ex. 23-24).

36.  The M/V Caleb Lay began backing.  (Doc. 61-3 at 160-161; Doc. 61-4 at 104).[6]

37.  The Eastlick boat struck the M/V Caleb Lay a second time.  (Doc. 61-3 at 148-150, Ex. 23-24; Doc. 61-4 at 105).

38.  The Eastlick boat lost power after the second impact.  (Doc. 61-3 at 165).

39.  After the incident, Forbess went to the head of the tow and then boarded the jon boat[7] in order to respond to the Eastlick boat.  (Doc. 61-3 at 163-164).

40.  When Forbess inspected the head of the tow following the incident, he was able to confirm the tow lights were working.  (Doc. 61-3 at 175).

41.  The Mate, Abram Dennis, also confirmed all three tow lights were illuminated.  (Doc. 61-6 at 36-38).[8]

42.  Following the incident, the Northern Kentucky Office of the State Medical Examiner performed toxicology testing and autopsies on both Stack and Eastlick.  (Doc. 61-5 at 484-510).

43.  The toxicology results confirm that Eastlick's blood alcohol level was 0.178 and Stack's blood alcohol level was 0.158.  (Doc. 61-5 at 488, 501; ORC § 1547.111; KRS §§ 235.240, 189A.010).[9]

---

[6] Claimant Stack further explains that a few seconds after the first impact, Pilot Long brought the controls back and thereafter it took approximately 7 or 8 seconds to dump the air out of the system.  Altogether it took the M/V Caleb Lay approximately 15 seconds to start backing.  (Doc. 61-4 at 104).

[7] A "jon boat" is a narrow flat-bottomed square-ended boat usually propelled by a pole or paddle and used on inland waterways.  Merriam-Webster Dictionary, at http://222.merriam-webster.com/dictionary (last visited Mar. 4, 2016).

[8] Claimant Stack alleges that Mr. Dennis initially testified that after the accident he did not inspect the head of tow, but later amended his testimony.  (Doc. 61-6 at 36-38).

[9] Claimant Eastlick admits this statement but denies the accuracy of the results to reflect the blood alcohol level of each claimant at the time of the collision and the time of death.

44.    Several empty beer bottles and cans were found in the Eastlick boat following the collision.  (Doc. 61-5 at 144-154).

45.    The medical examiner determined the cause of death for both men was blunt impact injuries to the head.  (Doc. 61-5 at 485, 498).

46.    On October 24, 2014, Petitioners initiated the instant action by filing a Complaint for Exoneration or Limitation of Liability.  (Doc. 1).

47.    The Estates for Stack and Eastlick both asserted claims against Petitioners for wrongful death, pre-death conscious pain and suffering, and loss of consortium/mental anguish.  (Docs. 10, 11).

### III.    STANDARD OF REVIEW

A motion for summary judgment should be granted if the evidence submitted to the Court demonstrates that there is no genuine issue as to any material fact, and that the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).  The moving party has the burden of showing the absence of genuine disputes over facts which, under the substantive law governing the issue, might affect the outcome of the action.  *Celotex*, 477 U.S. at 323.  All facts and inferences must be construed in a light most favorable to the party opposing the motion.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986).

A party opposing a motion for summary judgment "may not rest upon the mere allegations or denials of his pleading, but . . .  must set forth specific facts showing that there is a genuine issue for trial."  *Anderson*, 477 U.S. at 248 (1986).

# IV.   ANALYSIS

## A.   Limitation of Liability Act

Pursuant to the Limitation of Liability Act, 46 U.S.C. App. Section 183 *et seq.*,

> The liability of the owner of any vessel, whether American or foreign,
> …for any act, matter, or thing, loss, damage, or forfeiture, done,
> occasioned, or incurred, without the privity or knowledge of such
> owner or owners, shall not, except in the cases provided for in
> subsection (b) of this section, exceed the amount or value of the
> interest of such owner in such vessel, and her freight then pending.

46 U.S.C. App. § 183(a).  Pursuant to this statute, when a maritime loss occurs absent

privity or knowledge of the vessel owner, liability of the owner is limited to the value of

the owner's interest in the vessel and the vessel's pending freight.  *In re: Estate of*

*Charles Muer*, 146 F.3d 410, 414 (6th Cir. 1998).[10]

The determination of a limitation of liability claim is a two-step process.  First, a

court must determine what acts of negligence or conditions of unseaworthiness caused

the accident.  *Muer*, 146 F.3d at 415-16.  Second, if negligence is demonstrated, the court

---

[10] The Limitation of Liability Act states in relevant part as follows: "[t]he liability of the owner
of a vessel for any claim…or liability described in subsection (b) shall not exceed the value of
the vessel and pending freight."  46 U.S.C. § 30505(a).  Subsection (b) states in relevant part that
"claims…and liabilities subject to limitation under subsection (a) are those arising from…any
loss, damage, or injury by collision, or any act…done, occasioned, or incurred, without the
privity or knowledge of the owner."  *Id.* at § 30505(b).  The Act "alters the normal rules of
vicarious liability" by limiting the ship owner's liability for any injuries caused by the negligence
of the captain or crew to the value of the ship unless the owner himself had "privity or
knowledge" of the negligent acts.  *In re City of New York*, 522 F.3d 279, 283 (2d Cir. 2008). The
Act was passed "to encourage ship building and to induce capitalists to invest money in this
branch of industry."  *Norwich & N.Y. Transp. Co. v. Wright*, 80 U.S. 104, 121 (1871).  The Act
achieves this purpose by "exempting innocent shipowners from liability, beyond the amount of
their interest."  *Id.*

must determine whether the shipowner had knowledge or privity of those same acts of negligence or conditions of unseaworthiness. *Id.* The burden of proving negligence is on the claimant; the burden of proving lack of privity or knowledge is on the owner. *Id.*

Once a claimant has satisfied the initial burden of demonstrating negligence or unseaworthiness, the burden shifts to the shipowner to prove a lack of privity or knowledge. *American Dredging Co. v. Lambert*, 81 F.3d 127, 130 (11th Cir. 1996). As used in this context, "privity" or "knowledge" means a personal participation by the owner in some fault or act of negligence, or personal knowledge of matters likely to produce or contribute to the loss in the absence of adopting appropriate means of prevention. *M/V Sunshine II v. Beavin*, 808 F.2d 762, 763-64 (11th Cir. 1987). Privity and knowledge turn on the facts of each particular case, *H.&H. Wheel Serv., Inc. v. Cornet*, 219 F.2d 904, 914 (6th Cir. 1955), and they are established when the means of obtaining the requisite knowledge existed, or a reasonable inspection would have led to the requisite knowledge. *American Dredging*, 81 F.3d at 130.

The doctrine of pure comparative fault applies in admiralty and maritime tort cases. *Exxon Co, USA v. Sofec, Inc.*, 517 U.S. 830, 832, 836-37 (1996). When two or more parties have contributed by their fault to cause an injury or damage, liability is allocated among the parties in proportion to the comparative degree of their fault. Under the comparative fault system, liability is allocated only among parties whose actions were a proximate cause of the plaintiff's injury or damage. *Id.* at 837-38, 842.

### B. Negligence

First, Claimants must establish negligence.

The elements of negligence under maritime law generally echo those of a common law negligence action: duty, breach, causation, and damages. *Hartley v. St. Paul Fire & Marine Ins. Co.*, 118 F. App'x 914, 919 (6th Cir. 2004) (citing *Pearce v. United States*, 261 F.3d 643, 647-48 (6th Cir. 2001)). Thus, the claimants must demonstrate: (1) the existence of a duty of care owed by the ship owner to the claimants; (2) a breach of that duty; (3) a causal connection between the breach and the resulting injury, or proximate cause; and (4) actual damages. *Ginop v. A 1984 Bayliner 27' Cabin Cruiser*, 242 F. Supp. 2d 482, 485 (E.D. Mich. 2003) (citing

Claimants maintain that: (1) Petitioners' negligence was a proximate cause of the accident; and (2) the collision was foreseeable and avoidable by Petitioners.

The Inland Navigational Rules ("INRs"),[11] 33 C.F.R. § 83.01 *et seq*., impose a duty of care on vessel owners and operators to operate such vessels under the "rule of good seamanship" and in a safe and seaworthy manner. *See* Thomas J. Schoenhaum,

---

[11] The INRs are statutory rules that "apply to all vessels upon the inland waters of the United States." 33 U.S.C. § 2001. These Rules are the "Rules of the Road" governing navigation on inland waters. *See Turecamo Maritime, Inc. v. Weeks Dredge*, 872 F. Supp. 1215, 1229 (S.D.N.Y. 1994) ("The Inland Navigation Rules encompass long-standing steering and sailing rules and principles, otherwise known as 'Rules of the Road', which govern navigation on inland waters."). "These Congressionally sanctioned rules of navigation designed to prevent collision are based upon the fundamental principle that the vessel better able to control her movements should give way to a less able vessel. Indeed, anyone who undertakes operation of vessels on navigable waters is charged with knowledge of the and a mandatory duty to obey them." *Id.*

dmiralty & Maritime Law at 760-64 (2d ed. 1994).  Claimants argue that Petitioners

failed to meet the burdens imposed by the INRs.

Specifically, Claimants maintain that Captain Forbess was aware of a Coast Guard

Notice to Mariner's warning of increased pleasure craft traffic on the Ohio River in the

Cincinnati area because of a concert at Riverbend at the time of the accident.  (Doc. 61-3

at 222-23, 246-47).  Additionally, it was nighttime, there were background lights,[12]

intervening and visually obstructive bridge structures (Doc. 61-4 at 136), known

conditions that caused interference with the radar (Doc. 61-3 at 218-19),[13] and 1,000 feet

of tow ahead of the tug[14] (*Id.* at 205).   However, no lookouts were standing at the head

of the tow to help the Captain[15] and Pilot address issues associated with approaching

---

[12] The night of the accident there was no moonlight, combined with the calmness of the water, gave the water a "glassy" appearance.  (Doc. 66-2 at 22, 30-31).  On either side of the Cincinnati Harbor are large, well-lit buildings reflecting light upon the water making the shoreline and bridge structures difficult to discern.  (Doc. 66-4 at 220; Doc. 66-3 at 136; Doc. 66-2 at 32-33). Additionally, the numerous bridges in the area cast shadows over the water.  (Doc. 66-3 at 136).

[13] There is no evidence that Captain Forbess or Pilot Long used the trails feature on the M/V Caleb Lay's radar which would have allowed them to track multiple vessels' paths which rendered the vessel's radar virtually useless.  (Doc. 66-2 at 14 at 37).  *See also C.G. Willis, Inc. v. The Spica*, 6 F.3d 193, 196 (4th Cir. 1993) (Rule 7 is violated when a party fails to utilize available radar to avoid collision).

[14] Pilot Long admits "[a]ny type of barge will create some type of blind spot." (Doc. 66-3 at 74).

[15] Pilot Long testified that Inland Marine Service restricts use of electronic devised for personal business while in the wheelhouse to "emergency purposes" only.  (Doc. 61-4 at 38).  While on watch, crewmembers were prohibited from using cell phones for personal matters and prohibited from posting to social media sites such as Facebook.  (Doc. 61-6 at 22-23; Doc. 61-7 at 21; Doc. 61-9 at 31-32).  On the date of the accident at 10:04 p.m., roughly 52-53 minutes prior to the accident, a post was made to Captain Forbess' Facebook account (Doc. 61-3, Ex. 11).  This post was made while Captain Forbess was on watch, operating the M/V Caleb Lay, alone in the wheelhouse.  However, Forbess testified that he "do[es] not remember making this [post]." (Doc. 61-3 at 122).  Captain Forbess is no longer in possession of his cell phone.  (Doc. 64-8).

vessels.[16]

---

[16] Rule 5 provides that "[e]very vessel shall at all times maintain a proper lookout by sight and hearing as well as by all available means appropriate in the prevailing circumstances and conditions so as to make a full appraisal of the situation and of the risk of collision." 33 U.S.C. § 2005. Rule 7 requires every vessel to use all available means appropriate to the prevailing circumstances and to determine if a risk of collision exists. 33 U.S.C. § 2007. "It is the risk of collision, not the collision itself, that masters must avoid."

Rule 8, governing actions to avoid collision provides as follows:

(a) Any action taken to avoid collision shall, if the circumstances of the case admit, be positive, made in ample time and with due regard to the observance of good seamanship.
(b) Any alteration of course and/or speed to avoid collision shall, if the circumstances of the case admit, be large enough to be readily apparent to another vessel observing visually or by radar; a succession of small alterations of course or speed should be avoided.
(c) If there is sufficient sea room, alteration of course alone may be the most effective action to avoid a close-quarters situation provided that it is made in good time, is substantial and does not result in another close-quarters situation.
(d) Action taken to avoid collision with another vessel shall be such as to result in passing at a safe distance. The effectiveness of the action shall be carefully checked until the other vessel is finally past and clear.
(e) If necessary to avoid collision to allow more time to assess the situation, a vessel shall slacken her speed or take all way off by stopping or reversing her means of propulsion.
(f) Early action to allow room for safe passage:
        (1) a vessel which, by any of these Rules, is required not to impede the passage or safe passage of another vessel shall, when required by the circumstances of the case, take early action to allow sufficient sea room for the safe passage of the other vessel.
        (2) A vessel required not to impede the passage or safe passage of another vessel is not relieved of this obligation if approaching the other vessel so as to involve risk of collision and shall, when taking action, have full regard to the action which may be required by the Rules of this part.
        (3) A vessel the passage of which is not to be impeded remains fully obliged to comply with the Rules of this part when the two vessels are approaching one another so as to involve risk of collision.

33 C.F.R. § 83.08.

Captain Forbess saw the Eastlick boat approach at a speed he estimated to be 30 miles per hour in a zone he understood to be no wake, idle speed only.  (Doc. 61-3 at 102).  He watched the Eastlick boat approach for approximately two minutes, but did nothing to warn of the presence of his tow.[17]  (*Id.* at 158, 226).  Captain Forbess left the operator's chair despite the fact that the Eastlick boat was approaching.  (*Id.* at 156).[18] He did not sound a warning signal, slow the M/V Caleb Lay, nor make a radio call.[19]  (*Id.* at 115, 147, 157-58, 167).

Based upon the location of the M/V Caleb Lay in the Cincinnati harbor, which is visually obstructed by bridge structures and background lights, and in consideration of the actions of the approaching Eastlick boat as described by Captain Forbess, a reasonable person could conclude that the Caleb Lay should have made appropriate light

---

[17] Rule 34 requires vessels in doubt of the intention of other vessels approaching it to immediately indicate such doubt by giving at least five short and rapid blasts on the whistle. (Doc. 61-3 at 115).  When two vessels are headed toward one another, each vessel shall propose the manner of passing by radio communication or by blowing her whistle—once to propose passing on each vessel's port side and twice to propose passing on each vessel's starboard side. 33 U.S.C. § 2034(a).  Rule 36 permits vessels to direct the beams of their searchlights in "the direction of the danger in order to warn other vessels."  33 U.S.C. § 3036.  Rule 2 provides in relevant part that "[i]n construing and complying with these Rules due regard shall be had to all dangers of navigation and collision and to any special circumstances, including the limitations of the vessels involved."  33 U.S.C. § 2002.

[18]  Inland Marine Service company policy mandates that the change of watch must be postponed if it occurs during a critical stage of vessel operation.  (Doc. 61-4, Ex. 32).

[19] Rule 6 provides in pertinent part that "[e]very vessel shall at all times proceed at a safe speed so that she can take proper and effective action to avoid collision and be stopped within a distance appropriate to the prevailing circumstances and conditions…In determining a safe speed," factors to be considered include "the state of visability" and "the traffic density including concentration of fishing vessels or any other vessels."  33 U.S.C. § 2006(a)(i), (ii).

and sound signals to attract the Eastlick boat's attention, and that the Caleb Lay's failure to do so was a proximate cause of the accident which was foreseeable and avoidable by Petitioners. (Doc. 61-4 at 136; Doc. 61-3 at 218-19). Claimants argue that since Petitioners were in violation of multiple INRs, it was objectively and reasonably foreseeable that another vessel on the Ohio River could collide with the M/V Caleb Lay due to its own negligence.

### C. Lack of Privity or Knowledge

Since the Claimants satisfied the initial burden of demonstrating negligence, the burden shifts back to the Petitioners. Petitioners assert that pursuant to the superseding cause doctrine, Claimants' conduct absolves Petitioners of any liability.

The requirement of legal or proximate causation and the related superseding cause doctrine apply in admiralty cases and do not conflict with the principles of comparative fault. *Exxon*, 517 U.S. at 837. A plaintiff in admiralty who is the superseding cause and the sole proximate cause of her own injury cannot recover part of her damages from a defendant tortfeasor whose blameworthy actions were a cause in fact of the plaintiff's injury. *Id.* at 840. Claimants' extraordinary negligence can constitute an intervening force that supersedes Petitioners' prior negligence and breaks the chain of proximate causation required to impose liability upon the Petitioners even though the Petitioners' negligent acts or omissions were a cause in fact of the Claimants' death. *Id.* For the superseding cause doctrine to apply, the Claimants' death must actually be "brought about by a later cause of independent origin that was not foreseeable." *Id.* at 837, 841.

13

An intervening act will not exculpate the original wrongdoer as a superseding cause unless it is shown that the intervening act could not have been reasonably anticipated. *Vanderpool v. Edmondson*, No. 1:01cv147, 2004 U.S. Dist. LEXIS 25694, at *15-16 (E.D. Tenn Sept. 13, 2004).

Petitioners argue that the Eastlick boat violated multiple INRs:

(1)    Rule 5, by failing to maintain a look out which would have seen the navigation lights on the tow of the M/V Caleb Lay;

(2)    Rule 6, by traveling at 45 miles per hour through a no-wake zone in the dark;[20]

(3)    Rule 7, by failing to assess the risk of colliding with the M/V Caleb Lay's tow;

(4)    Rule 8, by not taking positive action made in ample time to avoid the collision;

(5)    Rule 9(a)(i), by failing to stay to the starboard side of the channel;

(6)    Rule 9(b), by turning into the path of a vessel (impeding) which can safely navigate only within a narrow channel;

(7)    Rule 9(d), by crossing the channel in front of the M/V Caleb Lay and its tow, thereby impeding a vessel which can only navigate safely in a narrow channel; and

(8)    as the give way vessel under Rules 9(b) and (d), the Eastlick boat violated Rule 16 when, as a vessel directed by the rules to keep out of the way of another vessel, the Eastlick boat failed to take early and substantial action to keep well clear of the M/V Caleb Lay and its tow.

(Doc. 70-2).

---

[20] "If a vessel is traveling at such a high rate of speed that it cannot take proper and effective action to avoid a collision, such as turning to starboard when the threat of collision is imminent, then the vessel is in violation of this rule." *Todd v. Schneider*, No. 2-01-2126-18, 2003 U.S. Dist. LEXIS 25192, at *39 (D.S.C. Dec. 8, 2003).

Petitioners argue that the only inference or conclusion that can be drawn from these facts is that the conduct of the Eastlick boat was unforeseeable, extraordinarily negligent, and the sole cause of the collision and resulting deaths of Stack and Eastlick. Specifically, Petitioners maintain that a professional mariner cannot be expected to anticipate or foresee an unpredictable, last second course change made by an intoxicated and untrained pleasure boat operator who was previously on course to make a safe port-to-port passage on a clear night in an uncrowded river.[21]

An intervening force supersedes prior negligence and breaks the chain of proximate causation required to impose liability on the original actor "where the subsequent actor's negligence was extraordinary." *Exxon*, 517 U.S. at 835. Extraordinary negligence is defined as negligence that is "neither normal nor reasonably forseeable." *Id.*

This Court cannot grant summary judgment to Petitioners on the ground that Claimants' negligence was so extraordinary that it constitutes an intervening force that was the superseding cause and the sole proximate cause of their deaths.  Viewing the record in the light most favorable to the Claimants, there are genuine issues of material fact in dispute concerning the nature, degree, and extent of the Claimants' negligence.

---

[21] Petitioners' reconstruction expert, George Randall, determined that: (1) the Eastlick boat was traveling at 45 miles per hour prior to the collision; and (2) the Eastlick boat made its sharp turn to port only 3 seconds prior to impact.  (Doc. 70-1 at PageID 1584).  Petitioners argue that during the two minutes the Eastlick boat was in Captain Forbess' view, it was traveling on a path to make a safe port-to-port pass as required by the INRs.  (Doc. 61-3 at 149-150, 160; Doc. 70-2).

15

Whether the Claimants' negligence constitutes the superseding cause and the sole

proximate cause of their deaths are issues that will have to be decided at trial.  *See,*

*e.g., White v. Lawrence*, 975 S.W.2d 525, 529-30 (Tenn. 1998) (proximate cause and

intervening, superseding cause are issues to be decided at trial and not on summary

judgment, unless the uncontroverted facts and the inferences drawn from those facts

permit objectively reasonable persons to reach only one conclusion).[22]

## V. CONCLUSION

Accordingly, for these reasons, Petitioners' motion for summary judgment

(Doc. 61) is **DENIED**.

**IT IS SO ORDERED**.

Date:  4/22/16                                    *s/ Timothy S. Black*
                                                   Timothy S. Black
                                                   United States District Judge

---

[22] Issues of negligence, apportionment of fault, and proximate causation ordinarily are not susceptible of being adjudicated on motions for summary judgment under Rule 56. *Daughenbaugh v. Bethlenhem Steel Corp.*, 891 F.2d 1199, 1205 (6th Cir. 1989).  *See also Exxon*, 517 U.S. at 841 ("The issues of proximate causation and superseding cause involve application of law to fact, which is left to the factfinder, subject to limited review.").  Where proximate cause is a mixed question of fact and law, there is a question of fact reserved for trial. *Ambraco, Inc. v. Project Europa MV*, 119 F. App'x 676, 677 (5th Cir. 2005) ("Questions of proximate cause and negligence, in admiralty cases, are questions of fact subject to review under the clearly erroneous standard.").